# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

NANCY A. FRITSCH,

        Plaintiff,

vs.                                   No. CIV 01-0713 LCS/KBM-ACE

FIRST SAVINGS BANK, PERFORMANCE
BANKERS, INC. and BRIAN YARRINGTON,

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** came before the Court on Defendant Brain Yarrington (Yarrington's) Motion for Summary Judgment on Count II of Plaintiff's Complaint (Doc. 95), filed March 12, 2002, Defendant Yarrington's Motion for Summary Judgment on Count V of Plaintiff's Complaint (Doc. 98), and Defendant First Savings Bank (FSB) and Performance Bankers Inc. (PBI's) Motion for Summary Judgment (Doc. 101), filed March 14, 2002. The United States Magistrate Judge, acting upon consent and designation pursuant 28 U.S.C. § 636(c), and having considered the briefs, submissions, relevant law, and being otherwise fully advised, finds that Defendant Yarrington's Motions are well-taken and should be **GRANTED,** and that Defendants FSB and PBI's Motion is well-taken in part and should be **GRANTED IN PART AND DENIED IN PART**.

## I.    Facts.

The following statement of facts is set forth in the light most favorable to Plaintiff, with all reasonable inferences from the record drawn in her favor. *See Clanton v. Cooper*, 129 F. 3d 1147, 1150 (10th Cir. 1997). Plaintiff, a female born on August 14, 1948, was hired by Defendant FSB on March 16, 1998 as a New Accounts Representative in its Las Cruces, New Mexico branch. (Compl.

¶9; FSB and PBI's Joint Answer ¶ 9.)  At the time she was hired, Plaintiff had twenty-six years of experience in banking and had held the positions of teller, new accounts representative, escrow clerk, back up loan closer, manager of escrow servicing, and collections manager.  (Pl. Ex. 24, Pl. Depo. at 7-11.)

Plaintiff was interviewed by FSB upper management members Dan Seifers, Jim Bunn and Brent Dykstra.  (Pl. Ex. 24, Pl. Depo. at 25.)  During her first interview, Mr. Dykstra pointed at a large bookcase full of bank policies and told Plaintiff that he was looking for someone who could read and adhere to those policies.  (*Id.*)  Plaintiff had a second interview with Dean Rigg, the Las Cruces Branch President.  (Pl. Ex. 24, Pl. Depo. at 33.)  Mr. Rigg asked Plaintiff how long she planned to work, and Plaintiff told him that she planned to work a minimum of ten years and that she could commit those years to FSB.  (*Id.* at 34.)

Plaintiff was told soon after she started working at FSB that Elrick Hawk was head of PBI, and that PBI controlled the all the FSB branches and set FSB policy.  (Pl. Ex. 24, Pl. Depo. at 48.)  All of the employee 401(k) information and insurance information came from PBI. (*Id.* at 139.)  Hawk had final approval authority for loans over $100,000.00.  (Pl. 27, Holguin Depo. at 52.)  Robert Holguin, an FSB officer, understood that FSB was a subsidiary of PBI and that Hawk was in charge of FSB.  (Pl. Ex. 27, Holguin Depo at 139.)  Hawk made the final decision to hire Shirley Hitson as the Silver City branch president. (Pl. Ex. 26, Hitson Depo. at 112.)  Similarly, Hawk interviewed Defendant Yarrington for the position of regional president. (Pl. Ex. 26 Hitson Depo. at 200.)  Hawk came into Plaintiff's office in Las Cruces at one point during a lending audit with Branch President Ken Recker to clear up a question, and determined that Plaintiff was following proper procedure. (Pl. Ex. 24, Pl. Depo. at 139-140.)

Plaintiff was informed when she was employed that she needed to bring in new accounts, if possible, as were all bank employees. (Pl. Ex. 24 , Pl. Depo. at 64.) However, in August 1998, Plaintiff was told that she was no longer permitted to leave the bank for customer contact. (*Id*. at 64-66.) The Las Cruces branch went through five different branch presidents during Plaintiff's period of employment. (Pl. Ex. 24 , Pl. Depo. at 137.)

In Plaintiff's April 30, 1998, 45 day performance review, Dean Rigg wrote that Plaintiff communicated well with others, effectively applied customer satisfaction skills, showed initiative, possessed the knowledge necessary for her job, exercised sound judgment, was professional, reliable and produced work of good quality. (Def. Ex. F.) Plaintiff was rated at "Meets" all criteria. (*Id*.) In the evaluation, Rigg offered suggestions for improvement such as arranging for additional training, working on correcting the causes of mistakes, rehearsing sales presentations in front of a mirror, and focusing attention of best prospects. (*Id*.) Rigg concluded that Plaintiff was "doing an excellent job" and suggested that she be promoted to a salaried bank officer. (*Id*.)

Rigg performed Plaintiff's 75 day performance review on May 29, 1998. (Def. Ex. G.) Rigg wrote that Plaintiff communicated well with others, adequately applied customer satisfaction skills, showed initiative, possessed the knowledge necessary for her job, exercised sound judgment, was professional, reliable and produced work of good quality. (*Id*.) Rigg stated that Plaintiff performed reasonably well as a sales representative most of the time, but had room for improvement. (*Id*.) Rigg observed that Plaintiff was able to work well as a member of a team. (*Id*.) Plaintiff was rated at "Meets" all criteria. (*Id*.)

In the 75 day performance evaluation, Rigg offered Plaintiff suggestions for improvement such as writing a brief outline of main points before communicating, asking customers questions to help

set up two-way communications, developing a list of difficult decision and a plan of how to handle them, reading company policy manuals, keeping a written record of calls made and pending, and cultivating relationships with existing customers. (Def. Ex. G.) Rigg again concluded that Plaintiff was "doing an excellent job" and again recommended that she be promoted. (*Id.*) Plaintiff was promoted to Financial Services Officer (FSO) with an annual base salary of $21,550.00. (FSB and PBI's Joint Answer ¶ 9.) Rigg told Plaintiff when she was promoted that her salary would go up as the years went by. (Pl. Ex. 24 at 180.) On August 3, 1998, Plaintiff submitted a list of goals for 1999. (Def. Ex. I.) On December 11, 1998, Marvin Franz, acting president, presented Plaintiff with a certificate of achievement. (Pl. Ex. 2.)

On December 17, 1998, Ken Recker performed Plaintiff's 1998 annual review. (Def. Ex. O.) Recker wrote that Plaintiff handled analytical tasks capably, communicated well with others, was skilled with computer systems, has adequate customer service skills, showed initiative, possessed the knowledge necessary for her job, was capable of exercising adequate judgment, was professional, reliable, performed reasonably well as a sales representative most of the time, and worked reasonably well in a team environment quality. (*Id.*) Plaintiff was rated at "Meets Minimum" in seven of thirteen criteria and "Meets" in the other six. (*Id.*) Recker offered suggestions for improvement such as seeking help from someone more experienced in complex situations, becoming more familiar with actions required in crisis situations, thinking about what other need to know about what is being done and informing them, and asking customer questions to set up two-way communications. (*Id.*)

Plaintiff was sent to training in Lincoln, Nebraska in late 1998. (Pl. Ex. 24, Pl. Depo. at 180.) Rigg explained that he had approved the expense because Plaintiff had been doing an exceptional job and had committed to a ten year minimum term. (*Id.* at 181.) In December 1998, Plaintiff received

a $500.00 incentive bonus. (Compl. ¶¶10 and 11; FSB and PBI's Joint Answer ¶¶ 10 and 11; Pl. Ex. 24, Pl. Depo. at 182.) When he gave her the bonus, Recker told Plaintiff that the next year's bonus would be even better. (Pl. Ex. 24, Pl. Depo. at 181.) He also told her that she was doing a good job and to keep up the good work. (*Id.*) On February 16, 1999, Plaintiff, along with several officers from each branch, was placed on an incentive plan for deposit growth. (Def. Ex. Q.)

In April 1999, Defendants FSB and PBI transferred thirty-nine-year-old Andy Reed to serve as president of the Las Cruces branch. (Compl. ¶13; FSB and PBI's Joint Answer ¶ 13; Def. Ex. T.) Around the same time, Defendants hired Brian Yarrington as Regional President. (*Id.*) At the time he was hired, Mr. Yarrington was twenty-nine years old. (Def. FSB Suppl. Ans to Pl. Int., Ex. A, Pl. Ex. 12.)

One of Plaintiff's duties as an FSO was "cross selling" of FSB products and services, but the FSO job description does not encompass targets for deposit growth. (Def. Ex. H.) After he became branch president, Reed discussed with Plaintiff the need to be more customer oriented, more organized, improve teamwork with co-workers, and increase deposits. (Reed Aff., Def. Ex. T.) Between August and December 1998, Plaintiff's percentages of deposit goals obtained were 11.31%, 13.71%, 18.20%, 19.76%, and 22.44% respectively. (Deposit Sheets Tracking by Responsibility Code, Def. Exs. J, K, L, M, and N.) Between January and October 1999, Plaintiff's percentages of deposit goals obtained were 16.24%, 24.64%, 27.32%, 32.38%, 29.35%, 22.19%, 14.89%, 7.49%, and 2.6% respectively. (Deposit Sheets Tracking by Responsibility Code, Def. Exs. P, R, S, U, V, W, and X.)

Plaintiff testified that she was the only FSO required to work as a teller from 2:00 p.m. until closing almost everyday. (Pl. Ex. 24, Pl. Depo. at 235.) Reed and Jesse Esparza would leave

Plaintiff as the only officer in the bank, thereby not allowing her to take a lunch hour on many occasions. (*Id.* at 236.) Reed allowed Chris McSparren, a younger woman, to be rude and insubordinate to Plaintiff. (*Id.* at 241.) Yarrington would acknowledge the males and younger women in the office, but would ignore Plaintiff and Judy Smith, another female employee in Plaintiff's age group. (Pl. Ex. 24, Pl. Depo. at 243-244; Pl. Ex. 28, Smith Depo. at 10.) Reed referred to Smith and Plaintiff, the only two women over forty in the Las Cruces branch, as "Judy I" and "Judy II." (*Id.* at 51.) Josephine Secret, a young female employee, was permitted to sit around the branch without shoes and eat most of the day because Yarrington and Seifers liked her. (Pl. 28, Smith Depo. at 66.) The operations meetings minutes from August 1999, indicate that the other branches had much more serious operations problems than the Las Cruces branch. (*Id.* at 247.)

On August 18, 1999, McSparren submitted a written complaint about Plaintiff to Reed. (Def. Ex. Z.) McSparren complained that Plaintiff asked McSparren to assist her when McSparren was busy doing other tasks, failed to help McSparren answer the phone, and was rude to McSparren. (*Id.*) McSparren's letter indicates that some of the friction may have been caused by the fact that only three person were assigned to run the entire branch that day. (*Id.*) While McSparren was critical of Plaintiff, Smith also submitted written complaint to Reed about McSparren, complaining that McSparren refused to help when needed. (Pl. 28, Smith Depo. at 25-26.)

On August 20, 1999, Mr. Reed wrote a memorandum for Plaintiff's file stating that police officers had came into the bank to pick up information concerning a summons. (Def. Ex. AA.) Reed recounted that McSparren, Laurie Sturges, and Jesse Esparza had reported that Plaintiff had been rude to the officers and the police officers were going to arrest her. (*Id.*) However, Esparza testified before the New Mexico Human Rights Commission that the officers threatened to take him to jail,

and not Plaintiff, and that Plaintiff may have been acting on "orders." (Def. Ex. BB.) Plaintiff testified that someone in the Deming branch, where the subpoenaed documents originated, directed her to obtain a certificate of compliance from the officer before releasing the documents. (Pl. Ex. 24, Pl. Depo. at 330.)

In September 17, 1999, Andy Reed gave Plaintiff a written warning. (Def. Ex. DD.) On Plaintiff's employee warning record, the December 1998 performance review was recorded as Plaintiff's first warning, and the September 17, 1999 warning was recorded as her second warning. (Def. Ex. EE.) Mr. Reed recounted that Plaintiff had been rated at "Meets Minimum" in seven of thirteen areas and at "Minimum" in the other six areas in the December 1998 annual performance review. (Def. Ex. DD.) Mr. Reed stated that Plaintiff was a "hard working employee, very analytical and knowledgeable" but that she had been ineffective as an FSO. (*Id.*) Mr. Reed observed that "deposits are down, reports have been late, and teamwork is non-existent." (*Id.*) Mr. Reed further noted that Plaintiff was constantly sidetracked, lacked leadership and time management skills, was always behind, and had personal agendas. (*Id.*) Mr. Reed gave Plaintiff until October 31, 1999 to improve her performance. (*Id.*)

Plaintiff testified that the classification of the December 1998 review as a first warning, and the September 1999 warning as her second warning on her Employee Record Form was a ploy to justify her termination. (Pl. Ex. 24, Pl. Depo. at 206.) Indeed, the Employee Record Forms for other terminated employees contained at least three warnings before termination. (Pl. Exs. 15 and 16.) Before the September 1999 warning, Plaintiff had not received any indication that her supervisors were unhappy with her performance. (Pl. Ex. 24, Pl. Depo. at 206-207.)

Plaintiff testified that Yarrington and Rebecca Moore, or that Yarrington and Reed contrived

the warning to get rid of Plaintiff and replace her with someone younger. (Pl. Ex. 24, Pl. Depo. at 185.)  Moore was the regional manager for operations and was involved in the hiring and firing of any FSO. (*Id*. at 203.)  When he gave her the written warning, Reed told Plaintiff that he did not want to discipline her, but that Yarrington and Moore had been pressuring him and that they had come to the office the evening before and told Reed that "the time was up." (*Id*. at 186.)  Plaintiff testified that her replacement had already come into the bank for interviews two weeks before the warning and three weeks before her termination. (*Id*. at 187.)  Plaintiff testified that Reed and Yarrington had discussed replacing her before the issued the warning.  (*Id*. at 206.)

Reed told Hitson in August or September 1999 that he was going to fire Plaintiff and hire someone who worked at White Sands Federal Credit Union.  (*Id*. at 138.)  Reed told Hitson that he was intending to fire Plaintiff because she was not getting along with McSparren and Yarrington "wanted her gone." (*Id*. at 140.)  During a management meeting in the same time frame, Yarrington asked Reed where he was on getting rid of Plaintiff.  (*Id*.)  Reed told Holguin that Plaintiff would be leaving and offered him her job in late August 1999. (Pl. 27, Holguin Depo. at 83; 120-121.)  Speer heard Yarrington or a branch president state that Plaintiff was not doing her job and was not as assertive as a young person would be.  (Pl. Ex. 29, Speer Depo. at 49.)

Plaintiff responded to the written warning on September 25, 1999, disagreeing with many of the issues outlined in the warning.  (Def. Ex. FF.)  Plaintiff asserted that she had never been given a first warning, her job description had not been given to her until months after she was promoted and that she had to consistently perform teller and proof duties due to staff shortages.  (*Id*.)  Plaintiff disputed that any reports had been late and that she performed substandard work. (*Id*.)  Additionally, she attributed her alleged deficiencies in leadership and teamwork to a lack of a chain of command

and unclear limits of authority.  (*Id*.)

After the warning, Reed "totally ignored" whatever Plaintiff did. (Pl. Ex. 24, Pl. Depo. at 193.) No specifics were give to Plaintiff as she had requested in her response.  (*Id*.)  Plaintiff e-mailed Reed every time she submitted a report.  (*Id*.)  Plaintiff asked Reed if he was monitoring her work and her told her that "[i]t doesn't matter.  They're not going to fire you.  Don't worry about it.  I know what you're doing.  Just forget about it."  (*Id*.)  Reed continued to leave her as the only officer in the bank and made no comments on her performance.  (*Id*.)  Reed refused to meet with her and follow through on the warning.  (Pl. Ex. 24, Pl. Depo. at 201.)

On November 5, 1999, Reed terminated Plaintiff's employment.  (Def. Ex. HH.)  When Reed gave Plaintiff the termination letter, he told her that he and Esparza were unable to talk Yarrington and Moore out of firing her, that she had done an excellent job, that FSB would not contest unemployment, and that she could put on future job applications that she had been laid off, but that she was not being laid off.  (Pl. Ex. 24, Pl. Depo. at 201.)   Hitson had the opportunity to observe Plaintiff's work and testified that Plaintiff's work performance  was "fine" and that Plaintiff was conscientious and "very helpful." (Pl. Ex. 26 Hitson Depo. at 137.)

Leslea Woods was twenty-four years old when she was hired to replace Plaintiff and had no experience as a teller, proof, auditor, or supervisor. (Pl. Ex. 32, Woods Depo. at 3.)   Woods had a bachelor's degree and had worked at White Sands Federal Credit Union in accounts receivable, accounts payable, and as a credit card representative. (*Id.*) Woods came into the Las Cruces branch before and after Plaintiff was terminated on a weekly basis. (Pl. 28, Smith Depo. at 79.)

Woods testified that the branch president, and not the FSO, was primarily responsible for generating new deposits.  (Pl. Ex. 32, Woods Depo. at 62.)  Similarly, Robert Holguin testified that his performance as an FSO was not measured by how much deposits went up or down or according

to teamwork.  (Pl. Ex. 27, Holguin Depo at 123.)  Moreover, Hector Briseño, the El Paso branch president, transferred accounts from Deming and Las Cruces to El Paso in the summer of 1999. (Pl. Ex. 27, Holguin Depo at 125.)

Plaintiff has submitted evidence that other females, both above and below age forty, were treated unfavorably.  Pat Weeks and Elizabeth Dale, female supervisors over forty, were demoted.  (Pl. Ex. 24, Pl. Depo. at 230; Pl. Ex. 28, Smith Depo. at 44.)  Another female FSO, Wendy Speer, was demoted, and a female branch president, Shirley Hitson, was terminated.  (*Id.*)  A female underwriter, Laurie Sturges, was also demoted.  (Pl. Ex. 24, Pl. Depo. at 232-233.)  Joanne Ballard testified that she asked Yarrington to place her in the T or C branch president position, but that Yarrington gave the position Don White instead.  (Pl. Ex. 22.)  Hawk ordered Hitson to fire Silver City branch president Lily Duran without cause.  (Pl. Ex. 26, Hitson Depo. at 112.) Duran had worked at the bank for 25 or 30 years. (*Id.*)  Pat Cleberg told Hitson that Hawk did not like female managers.  (*Id.* at 114.)  Hawk told Hitson that he was in the process of eliminating old employees. (*Id.* at 116.)

Female branches presidents were not permitted to process their own loans, while male branch presidents possessed such authority. (Pl. Ex. 25, Hart Depo. at 102.)  Female branch presidents were closely monitored on their attendance, but male branch presidents were permitted to come and go as they pleased.  (*Id.* at 103.)  When a female bank employee had an affair with a married branch president, upper management started watching the female bank employee in order to find reasons to get rid of her. (*Id.* at 106.)  A very competent and knowledgeable female branch president left the Ruidoso branch due to frustration over being short staffed.  (Pl. 27, Holguin Depo. at 92.)

Recker yelled at and inflicted verbal and emotional abuse on Hitson and women in general.

(Pl. Ex. 26 Hitson Depo. at 168.)  Hawk made an offensive joke about PMS at a annual PBI meeting and stated at that he did not like women managers.  (*Id*. at 206; 211-214.)  Yarrington commented at an FSO training session that Speer "sure looked good in her T-shirt." (*Id*. at 250.)

Will Hart testified that Yarrington referred to the female Ruidoso branch president as "sweetheart" or "honey," would tell her how beautiful she was during conference calls, and he never had any problems with this particular branch president's performance because she participated in his "shenanigans.' (Hart Depo. at 24-25.)  Females over 45 years old were "given an extraordinary amount of duties and the least amount of tools to get the duties done." (*Id*. at 28.)  "Better looking" women in the same types of positions were given preferential treatment and were not held accountable for mistakes. (*Id*. at 29-30.)  Yarrington would personally intercede to make sure Speer received preferential treatment for her computer problems. (*Id*. at 41.)

In addition, Plaintiff has submitted evidence that males were treated favorably.  Holguin was paid $28,000 per year as FSO of the T or C branch, which was $3,000 more than he had requested. (Pl. Ex. 27, Pl. Depo. Holguin Depo. at 26.)  A young male teller was promoted even though he mishandled cash transactions.  (Pl. Ex. 24, Pl. Depo. at 231.)  Another male employee was given multiple loans on insufficient collateral and allowed to continue his checking account after he wrote bad checks. (Pl. Ex. 24, Pl. Depo. at 234.)

Briseño, president of the El Paso branch, refused to hire a teller who was "fat and ugly," and instead hired a younger male.  (Pl. Ex. 27, Holguin Depo at 33-34.)  Briseño made loans to family members and made personal charges to his expense account. (Pl. Ex. 27, Holguin Depo at 131-133.)  One Saturday morning, Briseño required Holguin help him take an FSB van into the repair shop. (Pl. Ex. 27, Holguin Depo at 154.)  Briseño explained that Yarrington had wrecked the van the night

before and that he wanted to cover up the incident and make sure Hawk and Dykstra did not find out about it. (*Id*.)

Speer testified that Yarrington and Don White hired a former stripper with "really horrible credit" and no banking experience to work as a teller in the T or C branch. (Pl. Ex. 29, Speer Depo. at 86-87.) Villa testified that Recker used vulgar language. (Pl. Ex. 31, Villa Depo. at 29.) Briseño asked Villa if she was good at sex, but she did not put in a complaint " because he was the man." *Id*. at 56.) Recker made jokes about females. (Pl. Ex. 30, Stone Depo. at 70.)

Defendants admit that Yarrington "mooned" subordinates and had sexual relations with Speer, the FSO from the T or C branch. (FSB and PBI's Joint Answer ¶ 14; Pl. Ex. 24 at 160.) Karla Birgen, FSB's Vice President in charge of personnel and compliance, testified that Hitson informed Birgen that Yarrington had "mooned" Hitson and other bank employees while they were driving to dinner during a bank planning conference. (Pl. Ex. 23 at 16-17.) Hitson was driving a van full of FSB employees, when Yarrington instructed her to pull up next to a second van full of FSB employees. (Hart Depo. at 120-121.) Yarrington then pulled down him pants and "slapped his butt like a monkey." (*Id*. at 121.) Birgen informed Chuck Henderson about the incident, but did not otherwise follow up on it. (Pl. Ex. 23 at 18-19.) Hitson and Hart also informed upper management of the mooning incident. (Pl. Ex. 26, Hitson Depo. at 328-329; Pl. Ex. 25, Hart Depo. at 122, 286, 287, 288.) Plaintiff was not present for the mooning incident and only learned of it second hand from several bank employees. (Pl. Ex. 24 at 144-145.) Reed laughed about the mooning incident. (*Id*. at 147.)

Yarrington stated that he wanted his employees to party with him like a "family unit" and take his "back at a bar in case he [got] drunk." (Hart Depo. at 88-89.) Yarrington's attitude was that

"[e]ither you are with him or you were against him." (*Id.* at 89.)   Joining the Yarrington team involved "going out partying, chasing girls and drinking." (Follmer Statement ¶ 15, Pl. Ex. 11.) Employees that were too old or unattractive to participate in Yarrington's "shenanigans" fell into disfavor.  (Hart Depo. at 25-26.)

Plaintiff felt that the mooning incident, Yarrington's sexual relationship with Speer, and excessive partying indicated that he had dangerous propensities. (Pl. Ex. 24 at 160-161.) Plaintiff was paid $5,000 to $6,000 per year less than Speer, a younger female FSO with whom Yarrington had sex, even though Plaintiff had at least twenty years more banking experience than Speer.  (Pl. Ex. 24, Pl. Depo. at 163.)

## II.    Procedural Background.

On April 26, 2001, Plaintiff filed a complaint in the Third Judicial District Court, County of Doña Ana, State of New Mexico, alleging age and sex discrimination in the terms, conditions and privileges of employment under the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C.§ 621 *et seq.,* Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the New Mexico Human Rights Act, N.M.S.A. § 28-1-1 *et seq.* against Defendant FSB (Count I); and supplemental state law claims for civil conspiracy against Defendants Yarrington and PBI (Count II); negligent retention and supervision against Defendants FSB and PBI (Count III); breach of implied employment contract against Defendant FSB (Count IV); intentional interference with contractual relations against Defendant Yarrington (Count V); and appeal from the decision of the New Mexico Human Rights Commission against Defendants FSB and Yarrington (Count VI).

On June 22, 2001, Defendant removed the action to this Court pursuant to 28 U.S.C. §§ 1441 and 1446.  On August 17, 2001, Defendant PBI filed a Motion to Dismiss for Lack of Personal

Jurisdiction and to Dismiss Count III for failure to state a claim, and on August 23, 2001, Defendant Yarrington filed Motions to Dismiss Counts II and V for failure to state a claim. On October 24, 2001, I issued a Memorandum Opinion and Order denying these Motions.

On March 14, 2002, Defendant First Savings Bank filed its Motion for Summary Judgment, arguing that it is entitled to summary judgment on the ADEA and Title VII claims because Plaintiff failed to state a prima facie case in that she cannot demonstrate that she was satisfactorily preforming her job and failed to demonstrate pretext, that it is entitled to summary judgment on the breach of implied contract claim, that Yarrington and PBI are entitled to summary judgment on the civil conspiracy claim; that FSB and PBI are entitled to summary judgment on the negligent supervision and retention claim; that FSB is entitled to summary judgment on the appeal from the New Mexico Human Rights Commission; and that all claims against PBI should be dismissed for lack of personal jurisdiction. (Doc. 102.)

On March 12, 2001, Defendant Yarrington filed a Motion for Summary Judgment on Count II of Plaintiff's Complaint, arguing that he is entitled to summary judgment on the civil conspiracy claim, (Doc. No. 95), and a Motion for Summary Judgment on Count V of Plaintiff's Complaint, arguing that he is entitled to summary judgment on the intentional interference with contractual relations claim. (Doc. 98).

**III.     Standard for Summary Judgment.**

A motion for summary judgment may be granted only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact.' " *Munoz v. St. Mary Corwin Hosp.*, 221 F. 3d 1160, 1164 (10th Cir. 2000) (quoting Rule 56(c)). When applying this standard, the Court examines the record and makes all reasonable inferences in the light most favorable to the non-moving party. *Id*.

The movant bears the initial burden of establishing that no genuine issue exists as to any material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289 (1968)). The movant's initial burden may be discharged by showing there is an absence of evidence to support the non-moving party's case. *See Celotex v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying "a lack of evidence for the non movant on an essential element of the non movant's claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F. 3d 664, 671 (10th Cir. 1998). Once the movant meets its burden, the burden shifts to the non-moving party to demonstrate a genuine issue for trial on a material matter. *See McGarry v. Pitkin Co.*, 175 F. 3d 1193, 1201 (10th Cir. 1999).

If the moving party satisfies its initial burden, the party opposing the motion for summary judgment may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing there is a genuine issue for trial as to a dispositive matter for which it carries the burden of proof. *See Munoz,* 221 F. 3d at 1164. It is not sufficient "to simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co v. Zenith Radio Corp.*, 475 U.S. at 586. An issue of material fact is genuine if a reasonable jury could return a verdict for the party opposing the motion. *See Bullington v. United Air Lines*, Inc., 186 F. 3d 1301, 1313 (10th Cir.

1999). The substantive law at issue determines which facts are material in a given case. *See Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* The district court may only consider admissible evidence submitted to defeat summary judgment. *Starr v. Pearle Vision, Inc.*, 54 F. 3d 1548, 1555 (10th Cir. 1995); *Pastran v. K-Mart Corp.*, 210 F. 3d 1201, 1203 n. 1 (10th Cir. 2000).

Rule 56 provides that a court must consider "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any . . ." *See* FED. R. CIV. P. 56 (c). Only admissible evidence may be considered by a court when ruling on a motion for summary judgment. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F. 2d 1467, 1474 (10th Cir. 1985). To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence. *See IBP, Inc. v. Mercantile Bank of Topeka*, 6 F. Supp. 2d 1258, 1263 (D. Kan. 1998); 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 2722 at 384 (3d ed.1998). Materials that do not measure up to the standards of Rule 56 are subject to a motion to strike. *See Noblett v. General Elec. Credit Corp.*, 400 F. 2d 442, 445 (10th Cir.1968).

Defendants FSB and PBI assert that Plaintiff's facts "are in large part based upon inadmissible hearsay. . ." (Reply Mem. of Defs. FSB and PBI in Supp. of Mot. for Summ. J. at 2.) Although not raised by Plaintiff, the Court notes that many of Defendants exhibits are not properly authenticated. If not challenged by the opposing party, unauthenticated or otherwise inadmissible evidence may be considered by the Court. *See H. Sand & Co. v. Airtemp Corp.*, 934 F. 2d 450, 454 (2d Cir. 1991).

None of the parties has filed a motion to strike and no authority in support of their cursory assertion of hearsay. Because the parties have not properly challenged the submissions, the Court will consider them to the extent they are material.

## IV.    Analysis

### A.    Whether Defendants FSB and PBI are entitled to summary judgment on Plaintiff's ADEA and Title VII claims.

The ADEA prohibits an employer from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age...." 29 U.S.C. § 623(a)(1). Title VII prohibits an employer from discriminating against any individual with respect to the compensation, terms, conditions, or privileges of employment on the basis of national origin. *See* 42 U.S.C. § 2000e-2(a)(1).

A plaintiff alleging discrimination in violation of either the ADEA or Title VII may prove intentional discrimination through direct evidence, or through indirect evidence using the analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). Indirect evidence is often offered in cases alleging discrimination because there is rarely direct evidence of discrimination. *Ingels v. Thiokol Corp.*, 42 F. 3d 616, 620-21 (10th Cir.1994).

In this case, Plaintiff relies on indirect evidence. Under *McDonnell Douglas*, Plaintiff has the initial burden of establishing a prima facie case by a preponderance of the evidence. *McDonnell Douglas*, 411 U.S. at 802-804; *Munoz,* 221 F. 3d at 1165. If the plaintiff establishes a prima facie case, then the defendant must "articulate some legitimate, nondiscriminatory reason" for the challenged personnel action. *McDonnell Douglas*, 411 U.S. at 802-804. The plaintiff then bears the

ultimate burden of demonstrating that the defendant's stated reason is in fact a pretext for unlawful discrimination.  *Id*. at 804.

1.       **Whether Plaintiff has established a prima facie case under the ADEA and Title VII.**

Defendant asserts that Plaintiff has failed to establish a prima facie case under the ADEA and Title VII because she cannot demonstrate that she was satisfactorily preforming her job.  In order to state a prima facie case for age discrimination under the ADEA or Title VII, Plaintiff must show that (1) she was within the protected class (over forty years old or female), (2) an adverse employment action was taken against her, (3) she was doing satisfactory work at the time the adverse employment action was taken, and (4) there is some evidence that the employer intended to discriminate against her on the basis of her age or gender.  *See O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312 (1996); *Beaird v. Seagate Tech, Inc.*, 145 F. 3d 1159, 1165 (10th Cir. 1998); *Perry v. Woodward*, 199 F. 3d 1126, 1135 (10th Cir.1999).

Defendant does not dispute that Plaintiff was a female over forty years old, that an adverse employment action was taken against her, or that she was replaced by a significantly younger woman. Instead, Defendant argues that Plaintiff has failed to establish that she was doing satisfactory work at the time she was terminated.  In order to meet the second element of the prima facie case, the Plaintiff need only show that her performance was of "sufficient quality to merit continued employment, thereby raising an inference that some other factor was involved in the decision" to discharge her.  *Denison v. Swaco Geolograph Co.*, 941 F. 2d 1416, 1420-21 (10th Cir.1991); *MacDonald v. Eastern Wyo. Mental Health Ctr.*, 941 F. 2d 1115, 1121 (10th Cir.1991).  Requiring a "'plaintiff in an age discrimination case to demonstrate that [her] performance was flawless

unnecessarily collapses the steps suggested by *McDonnell Douglas* by shifting considerations which are more appropriate to the employer's rebuttal phase to the earlier requirement that the employee demonstrate competence to perform the specified work.'" *Denison*, 941 F. 2d at 1420-21 (*quoting Powell v. Syracuse University*, 580 F. 2d 1150, 1155 (2d Cir. 1978)).

At the prima facie stage, the employer's subjective reasons for the adverse action are not properly considered, and should instead be "considered in addressing whether those articulated reasons are legitimate or merely a pretext for discrimination." *Ellis v. United Airlines, Inc.*, 73 F. 3d 999, 1005 n. 8 (10th Cir. 1996). A prima facie showing can be made through credible evidence that a plaintiff was qualified even if that evidence is disputed by the employer. *Id*. "[A] plaintiff may make out a prima facie case of discrimination in a discharge case by credible evidence that she continued to possess the objective qualifications she held when she was hired, or by her own testimony that her work was satisfactory, even when disputed by her employer, or by evidence that she had held her position for a significant period of time." *MacDonald*, 941 F. 2d at 1121; *see also English v. Colorado Dept. of Corrections,* 248 F. 3d 1002, 1008 (10th Cir. 2001); *Bullington*, 186 F. 3d at 1316 n. 11; *Kenworthy v. Conoco, Inc.*, 979 F. 2d 1462, 1470 (10th Cir.1992).

Plaintiff received favorable performance reviews, a promotion, a certificate of achievement, and a $500.00 bonus. Plaintiff maintained the same objective qualifications she had when she was hired and held her position for over eighteen months. Defendants' arguments go to the weight of the evidence of satisfactory performance, not Plaintiff's prima facie burden to produce such evidence. Plaintiff has met her burden of production by introducing some evidence of good performance. Since none of the other elements are at issue, Plaintiff has established a prima facie case of age and sex discrimination

### 2. Whether Defendant has articulated a legitimate, non-discriminatory reason for Plaintiff's termination.

Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action suffered by the plaintiff. *Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F. 3d 1172, 1176-1176 (10th Cir. 2001); *Munoz,* 221 F. 3d at 1165. The defendant's burden at the second stage of the *McDonnell Douglas* analysis is one of production, not one of persuasion. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). "To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981). Defendants assert that Plaintiff was terminated for poor performance. Defendant has met its burden of production with respect to showing a non-discriminatory business reason for its action. The burden now shifts back to Plaintiff to demonstrate pretext.

### 3. Whether Plaintiff has established that Defendant's stated reason for her termination was pretextual.

A plaintiff can show pretext by revealing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence." *Morgan v. Hilti, Inc.*, 108 F. 3d 1319, 1323 (10th Cir. 1997) (quotations omitted). However, "mere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988). "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully

discriminated." *Reeves*, 530 U.S. at 148.

The plaintiff must establish "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves*, 530 U.S. at 143. This is accomplished by showing "either that a discriminatory reason more likely motivated the employer or . . . that the employer's proffered explanation is unworthy of credence." *Bullington*, 186 F. 3d at 1317 (*citing Burdine*, 450 U.S. at 256). One way to show pretext is to provide evidence that the defendant's reasons are unworthy of belief. *Goodwin v. General Motors Corp.*, 275 F. 2d 1005, 1013 (10th Cir. 2002). Another way to show pretext is with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by defendant under the circumstances. *Kendrick v. Penske Transp. Servs. Inc.*, 220 F. 3d 1220, 1230 (10th Cir. 2000) (post *Reeves* case). Yet another way pretext may be shown is with evidence that the defendant acted contrary to an unwritten policy or practice when making the adverse employment decision affecting the plaintiff. *Id.*

The plaintiff "may not be forced to pursue any particular means of demonstrating that [a defendant's] stated reasons are pretextual." *Kendrick*, 220 F. 3d at 1230 (*quoting Patterson v. McLean Credit Union*, 491 U.S. 164, 187-88 (1989)). When assessing a contention of pretext, as opposed to the second element of the prima facie case, it is the manager's perception of the employee's performance, and not the employee's subjective evaluation of his performance, that is relevant. *Shorter v. ICG Holdings, Inc.*, 188 F. 3d 1204, 1209 (10th Cir.1999). The court may not second guess the business judgment of the employer. *Simms v. Oklahoma ex rel. Dept. of Mental Health & Substance Abuse Servs.*, 165 F. 3d 1321, 1330 (10th Cir. 1999). "[A] prima facie case and sufficient evidence to reject the employer's explanations may permit a finding of liability" under the ADEA or Title VII. *Kendrick*, 220 F. 3d at 1230 (*quoting Reeves*, 530 U.S. at 142).

Plaintiff offers numerical evidence in support of her claim of pretext. While statistical evidence may create an inference of discrimination, the evidence may be so flawed as to render it insufficient to raise a jury question. *Doan v. Seagate Technology, Inc.,* 82 F. 3d 974, 979 (10th Cir.1996); *Ortega v. Safeway Stores, Inc.*, 943 F. 2d 1230, 1243 (10th Cir.1991). Statistical evidence which fails to properly take into account nondiscriminatory explanations does not permit an inference of pretext. *Martinez v. Wyoming, Dept. of Family Services*, 218 F. 3d 1133, 1138 (10th Cir. 2000); *Rea v. Martin Marietta Corp.*, 29 F. 3d 1450, 1456 (10th Cir.1994). "Statistics taken in isolation are generally not probative of age discrimination." *Jones v. Unisys Corp.*, 54 F. 3d 624, 632 (10th Cir.1995). Plaintiff's numerical evidence fails to take into account nondiscriminatory explanations and her sample size is small. Moreover, the numerical evidence is not necessary for Plaintiff to show pretext. Under these circumstances, the Court declines to deem the numerical evidence probative of pretext for the purposes of the summary judgment analysis.

The balance of the evidence is sufficient to establish pretext. Defendants claim that one of the primary reasons why Plaintiff was terminated was lack of deposit growth. However, meeting a target for deposit growth is not in Plaintiff's job description. (Def. Ex. H.) While the job description refers to "cross-selling," it does not even mention meeting deposit growth percentages. (*Id.*) Morever, Woods testified that the branch president, and not the FSO, was primarily responsible for generating new deposits at the Las Cruces branch. (Pl. Ex. 32, Woods Depo. at 62.) In addition, Holguin testified that his performance as an FSO was not measured by how much deposits went up or down. (Pl. Ex. 27, Holguin Depo at 123.)

Furthermore, Plaintiff has presented evidence that lack of growth in deposits may have been caused by factors beyond her control. Briseño transferred accounts from Deming and Las Cruces to

22

El Paso in the summer of 1999. (Pl. Ex. 27, Holguin Depo at 125.) Plaintiff testified that she was the only FSO required to work as a teller from 2:00 p.m. until closing almost everyday. (Pl. Ex. 24, Pl. Depo. at 235.) Plaintiff was also instructed not to leave the bank to solicit new business. Plaintiff has met her burden of establishing that the lack of deposit justification was pretextual.

Another stated reason for Plaintiff's termination was lack of teamwork. While it is true that McSparren submitted a letter critical of Plaintiff, Smith submitted a letter critical of McSparren. (Pl. 28, Smith Depo. at 25-26.) McSparren's letter also indicates that the friction may have been caused by lack of staff in the bank, and not Plaintiff's ability to maintain teamwork. (Def. Ex. Z.) Similarly, Holguin testified that his performance as an FSO was not measured by his ability to promote teamwork. (Pl. Ex. 27, Holguin Depo at 123.) Accordingly, Plaintiff has met her burden that the lack of teamwork excuse may have been pretextual.

In addition to lack of deposit growth and teamwork, Defendant contends that Plaintiff's poor job performance in general was the reason for her termination. However, when Reed gave Plaintiff the termination letter, he told her that she had done an excellent job, and that she could put on future job applications that she had been laid off, even though she was not being laid off. (Pl. Ex. 24, Pl. Depo. at 201.) Hitson testified that Plaintiff's work performance was "fine" and that Plaintiff was conscientious and "very helpful." (Pl. Ex. 26 Hitson Depo. at 137.) The operations meetings minutes from August 1999, indicate that the other branches had much more serious operations problems than the Las Cruces branch. (Pl. Ex. 24, Pl. Depo. at 235.) Plaintiff's evaluations were satisfactory, even though they left room for improvement. This evidence also bolsters Plaintiff's showing of pretext.

Finally, Plaintiff has presented evidence that management wanted to get rid of Plaintiff and replace her with someone younger. When he gave her the written warning, Reed told Plaintiff that

he did not want to discipline her, but that Yarrington and Moore had been pressuring him and that they had come to the office the evening before and told Reed that the time was up. ((Pl. Ex. 24, Pl. Depo. at 186.) Plaintiff testified that Woods, her replacement, had already come into the bank for interviews two weeks before the warning and three weeks before her termination. (*Id*. at 187.) Plaintiff testified that Reed and Yarrington had discussed replacing her before the issued the warning. (*Id*. at 206.)

Reed told Hitson in August or September 1999 that he was going to fire Plaintiff and hire someone who worked at White Sands Federal Credit Union, which is exactly what he ended up doing. (Hitson Depo.. at 138.) Reed told Hitson that he was intending to fire Plaintiff because Yarrington wanted her gone. (*Id*. at 140.) During a management meeting in the same time frame, Yarrington asked Reed where he was on getting rid of Plaintiff. (*Id*.) Reed told Holguin that Plaintiff would be leaving and offered him her job in late August 1999. (Pl. 27, Holguin Depo. at 83; 120-121.) Speer heard Yarrington or a branch president state that Plaintiff was not doing her job and was not as assertive as a young person would be. (Pl. Ex. 29, Speer Depo. at 49.)

Plaintiff has also presented evidence that female employees over the age of forty were treated less favorably than younger females and males. If a female worker was not one of the "better looking females," Yarrington faulted her performance. (Hart Depo. at 30.) "Babes" were treated better than the older workers. (*Id*. at 87-88.). Employees that were too old or unattractive to participate in Yarrington's "shenanigans" fell into disfavor. (Hart Depo. at 25-26.) Woods was twenty-four years old when she was hired to replace Plaintiff and had no experience as a teller, proof, auditor, or supervisor. (Pl. Ex. 32, Woods Depo. at 3.)

Taken together with Plaintiff's prima facie case, these facts tend to show that Defendant used

Plaintiff's alleged poor performance as an excuse for terminating Plaintiff based on her age or gender. Plaintiff has met her burden of showing pretext. *See Reeves*, 530 U.S. at 148; *Goodwin*, 275 F. 2d at 1013. Defendant FSB and PBI's Motion for Summary Judgment should be denied as to Plaintiff's claims under the ADEA and Title VII.

**B.      Whether Defendant FSB is entitled to summary judgment on Plaintiff's breach of contract claim.**

In Count IV, Plaintiff alleges that there was an implied agreement that she would remain an employee for at least and additional ten years and could be discharged only for cause and that Defendants breached this agreement by terminating her. Defendant FSB and PBI claim they are entitled to summary judgment on this claim because there was no implied employment contract.

New Mexico substantive law applies to this and Plaintiff's other supplemental state law claims. *BankOklahoma Mortgage Corp. v. Capital Title Co.,* 194 F. 3d 1089, 1103 (10th Cir. 1999). Under New Mexico law, an employer creates an implied contract of employment where its words and actions create a reasonable expectation of termination only for cause. *See Hartbarger v. Frank Paxton Co.*, 115 N.M. 665, 668, 857 P. 2d 776, 779 (1993). "An implied contract is created only where an employer creates a reasonable expectation. The reasonableness of expectations is measured by just how definite, specific, or explicit has been the representation or conduct relied upon." *Id.*, 115 N.M. at 672, 857 P. 2d at 783. The totality of the circumstances surrounding the employment relationship must support a findings that the employer has made a promise that modifies an employee's at will status. *Newberry v. Allied Stores*, 108 N.M. 424, 427, 773 P.2d 1231,1234 (1989).

Plaintiff bases her breach of implied employment contract claim on the following evidence.

Plaintiff stated during her employment interview that she planned to work a "minimum of ten more years and would be willing to commit" for those years, Rigg sent Plaintiff to out-of-state training in Nebraska in November 1998 because she had committed to a ten-year minimum, Rigg stated that her salary would continue to go up, and Recker stated that her 1999 bonus would be larger than her 1998 bonus. (Pl. Depo. at 34; 181, Def. Ex. E, Pl. Ex. 25.)

Defendant points out that when she was hired, Plaintiff signed an acknowledgment stating in pertinent part:

> I understand that I am free to resign at any time, with or without cause and without prior notice, and the employer reserved the same right to terminate my employment at any time, with or without cause and without prior notice, except as may be required by law. This application does not constitute an agreement or contract for employment for any specified period or definite duration. I under stand that no representative of the employer, other than an authorized officer, has any authority to make any assurances to the contrary. I further under stand that any such assurance must be in writing and signed by an authorized officer.

It is undisputed that there was no written express or implied employment contract.

Plaintiff's own statements are insufficient to create and employment contract. The statements by Rigg and Recker that Plaintiff's pay and bonuses would increase are insufficient to give rise to a contract for employment. Moreover, the disclaimer contained in the employment application clearly alerted Plaintiff to her at will status. The totality of the circumstances surrounding the employment relationship does not support a finding that the FSB's words and actions created a reasonable expectation of termination only for cause. *Hartbarger*, 115 N.M. at 668, 857 P. 2d at 783.

After examining the record regarding the totality of the circumstances, and resolving all reasonable inferences in the light most favorable to Plaintiff, the Court finds that Plaintiff has failed

to demonstrate a genuine issue for trial as to her claim for breach of implied employment contract. Therefore, Defendant FSB is entitled to summary judgment on Plaintiff's breach of implied employment contract claim as alleged in Count IV.

**C.    Whether Defendant Yarrington is entitled to summary judgment on Plaintiff's claim for intentional interference with contractual relations.**

In Count V, Plaintiff claims that Yarrington is liable for intentional interference with her contractual relationship with FSB. Plaintiff's at will employment contract with FSB is deemed a prospective contract and may give rise to liability under this theory. *Kelly v. St. Vincent Hosp.*, 102 N.M. 201, 207, 692 P.2d 1350, 1356 (Ct. App.1984). The tort of intentional interference with prospective contractual relations requires a plaintiff to prove that a defendant "'improperly interfered with the plaintiff's contractual relations, either through improper means or improper motive.'" *Santa Fe Technologies, Inc. v. Argus Networks, Inc.*, ___ N.M. ___, 42 P.3d 1221, 1235 (*quoting Morris v. Dodge Country, Inc.*, 85 N.M. 491, 492, 513 P.2d 1273, 1274 (Ct. App.1973)).

The plaintiff must demonstrate that the defendant used improper means or acted with an improper motive intended solely to harm the plaintiff. *Silverman v. Progressive Broadcasting, Inc.*, 125 N.M. 500, 507, 964 P.2d 61, 70 (Ct. App. 1998) (*citing Kelly*, 102 N.M. at 207, 69 P.2d at 1356); *see also Clough v. Adventist Health Sys., Inc.*, 108 N.M. 801, 806, 780 P.2d 627, 632 (1989). Accordingly, to survive summary judgment, Plaintiff must show that Defendant Yarrington's sole motive in imposing the discipline and termination was to harm Plaintiff. *Id.*

The evidence of record demonstrates that Defendant Yarrington did not act with the sole motive to harm Plaintiff, but was motivated, at least in part, by a desire to improve performance of the Las Cruces branch. The Court has examined the record and resolving all reasonable inferences

in the light most favorable to Plaintiff. The Court finds that Plaintiff has failed to demonstrate a genuine issue for trial as to her claim for intentional interference with her contractual relationship with FSB. Therefore, Defendant Yarrington is entitled to summary judgment on Plaintiff's intentional interference with her contractual relations claim as alleged in Count V.

**D.** **Whether Defendants PBI and Yarrington are entitled to summary judgment on Plaintiff's civil conspiracy claim.**

In Count II, Plaintiff alleges civil conspiracy against Yarrington and PBI. Specifically, Plaintiff alleges that Yarrington, together with PBI and "various unnamed co-conspirators who were working with entities affiliated with" FSB and PBI engaged in a civil conspiracy to deprive Plaintiff of the rights to which she was entitled as a female over age forty and to interfere with her employment at FSB. (Comp. ¶ 28.)

The elements of civil conspiracy under New Mexico law are "'(1) that a conspiracy between two or more individuals existed; (2) that specific wrongful acts were carried out by the defendants pursuant to the conspiracy; and (3) that the plaintiff was damaged as a result of such acts.'" *Ettenson v. Burke*, 130 N.M. 67, 72, 17 P.3d 440, 445 (Ct. App. 2000) (*quoting Silva v. Town of Springer*, 121 N.M. 428, 434, 912 P.2d 304, 309 (Ct. App. 1996)). A civil conspiracy must actually involve an independent, unlawful act that causes harm--something that would give rise to a civil action on its own. *Las Luminarias of the New Mexico Council of the Blind v. Isengard*, 92 N.M. 297, 300, 587 P.2d 444, 447 (Ct. App.1978).

"The purpose of a civil conspiracy claim is to impute liability to make members of the conspiracy jointly and severally liable for the torts of any of its members. *Ettenson v. Burke*, 130 N.M. at 72, 17 P.3d at 445 (*citing Beck v. Prupis*, 162 F. 3d 1090, 1099 n. 18 (11th Cir.1998)). Civil

conspiracy is not a separate, actionable cause of action unless the plaintiff has an actionable civil case against one of the conspirators. *Armijo v. National Sur. Corp.*, 58 N.M. 166, 178, 268 P.2d 339, 347 (1954). "A conspiracy may be established by circumstantial evidence; generally, the agreement is a matter of inference from the facts and circumstances, including the acts of the persons alleged to be conspirators." *Morris v. Dodge Country, Inc.*, 85 N.M. 491, 492, 513 P.2d 1273, 1274 (Ct. App.1973). A plaintiff cannot establish civil conspiracy without presenting specific facts showing agreement and concerted action among defendants. *Durre v. Dempsey*, 869 F. 2d 543, 545 (10th Cir. 1989).

Plaintiff has failed to present specific facts showing agreement and concerted action among Defendants Yarrington and PBI. A jury could not find a conspiracy based on the evidence presented by Plaintiff without engaging in unwarranted speculation. Accordingly, summary judgment should be granted on this claim. The Court has examined the record and resolving all reasonable inferences in the light most favorable to Plaintiff. The Court finds that Plaintiff has failed to demonstrate a genuine issue for trial as to her claim for civil conspiracy. Therefore, Defendants Yarrington and PBI are entitled to summary judgment on Plaintiff's civil conspiracy claim as alleged in Count II.

**E.      Whether Defendants FSB and PBI are entitled to summary judgment on Plaintiff's negligent supervision and retention claim.**

In Count III, Plaintiff alleges the tort of negligent retention and supervision against Defendants FSB and PBI. Specifically, Plaintiff alleges that Defendants FSB and PBI should have been aware of Defendant Yarrington's wrongful conduct and dangerous propensities and that it was foreseeable that his tortious conduct would result in harm or injury to Plaintiff. (Comp. ¶ 32.)

An employer may be liable in tort for negligent retention, supervision, and training for the

wrongful conduct of an employee even though the employer is not responsible for such acts under the doctrine of respondeat superior. *Pittard v. Four Season s Motor Inn, Inc.*, 101 N.M. 723, 729, 688 P.2d 333, 339 (Ct. App. 1984); *Valdez v. Warner*, 106 N.M. 305, 307, 742 P.2d 517, 519 (Ct. App. 1987). In order to support a claim for negligent hiring and retention, there must be evidence that the employee was unfit, considering the nature of the employment and the risk he posed to those with whom he would foreseeably associate, and that the employer knew or should have known that the employee was unfit. *Valdez*, 106 N.M. at 307, 742 P.2d at 519 (citing, Restatement (Second) of Agency §213 cmt. d (1958) and *F & T Co. v. Woods*, 92 N.M. 697, 699, 594 P.2d 745, 747 (1979)). Employer liability flows from the employer's duty to those people whom he might reasonably anticipate would be injured as a result of retaining the unfit employee. *Valdez*, 106 N.M. at 307, 742 P.2d at 519.

The proper standard for determining whether an employer should be held liable for negligent supervision or retention of an employee does not require proof of actual knowledge of the employee's lack of skills or unfitness to perform such work, but whether the employer knew or reasonably should have known that some harm might be caused by the acts or omissions of the employee who is entrusted with such position. *Los Ranchitos v. Tierra Grande, Inc.*, 116 N.M. 222, 861 P.2d 263 (Ct. App. 1993) (*citing F & T Co. v. Woods*, 92 N.M. at 699, 594 P.2d at 747). In order to survive summary judgment on her negligent supervision and retention claim, Plaintiff must show that a genuine issue of material fact exists as to whether: (1) an employee of Defendant FSB or PBI engaged in a wrongful act that injured her; and (2) that Defendant FSB or PBI was negligent in supervising or retaining that employee.

Plaintiff has presented evidence that Defendants FSB and PBI knew or should have known

that Defendant Yarrington mooned employees and that there were variations in the salaries or FSOs.

However, Plaintiff has presented no evidence linking the mooning incident to her termination or that

Defendants FSB or PBI knew or should have known that Defendant Yarrington may have

discriminated against female employees above the age of forty before she was terminated.  Plaintiff

has failed to show that any salary discrepancies were not justified by legitimate factors.  The Court

has examined the record and resolving all reasonable inferences in the light most favorable to Plaintiff.

The Court finds that Plaintiff has failed to demonstrate a genuine issue for trial as to her claim for

negligent retention and supervision.  Therefore, Defendants FSB and PBI are entitled to summary

judgment on Plaintiff's civil negligent retention and supervision claim as alleged in Count III.

**F.  Whether Defendants FSB and PBI are entitled to summary judgment on Plaintiff's NMHRA claim.**

In Count VI, Plaintiff appeals from the adverse decision of the New Mexico Human Rights

Commission.  Plaintiff alleges this claim against Defendants FSB and Yarrington. Defendants claim

that they are entitled to summary judgment based on the same arguments they raised with respect to

Plaintiff's ADEA and Title VII claims.  Plaintiff failed to separately respond to this argument.

Plaintiff's burden of establishing a prima facie case under the New Mexico Human Rights Act,

NMSA § 28-1-7, is identical to her burden under Title VII.  *Cates v. Regents of the New Mexico*

*Institute of Mining & Technology*, 124 N.M. 633, 636, 954 P. 2d 65, 70 (N. M. 1998).  Based on

the analysis in Section (III)(A), *supra*, Defendants are not entitled to summary judgment on this

claim.

**G.  Whether all claims against PBI should be dismissed for lack of personal jurisdiction.**

Defendants FSB and PBI argue that all claims against PBI be dismissed for lack of personal

jurisdiction. I previously addressed this issue in my Memorandum Opinion and Order of October 24, 2001, and determined that this Court has personal jurisdiction over Defendant PBI. For the same reasons set out in my Memorandum Opinion and Order of October 24, 2001, I find that the exercise of personal jurisdiction over Defendant PBI is proper. Accordingly, Defendants FSB and PBI's Motion for Summary Judgment is denied with respect their argument that this Court lacks of personal jurisdiction over Defendant PBI.

## V.    Conclusion.

Upon review of the evidence presented, the Court has determined that Defendant Yarrington's Motion for Summary Judgment on Count II of Plaintiff's Complaint (Doc. 95), filed March 12, 2002, Defendant Yarrington's Motion for Summary Judgment on Count V of Plaintiff's Complaint (Doc. 98), should be **GRANTED.**

Defendant FSB and PBI's Motion for Summary Judgment (Doc. 101), filed March 14, 2002, should be **GRANTED IN PART AND DENIED IN PART**.

**WHEREFORE,**

**IT IS ORDERED** that Defendant Yarrington's Motion for Summary Judgment on Count II of Plaintiff's Complaint (Doc. 95), filed March 12, 2002, is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendant Yarrington's Motion for Summary Judgment on Count V of Plaintiff's Complaint (Doc. 98), filed March 12, 2002, is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendant FSB and PBI's Motion for Summary Judgment (Doc. 101), filed March 14, 2002, is **DENIED AS TO COUNT I.**

**IT IS FURTHER ORDERED** that Defendant FSB and PBI's Motion for Summary Judgment (Doc. 101), filed March 14, 2002, is **GRANTED AS TO COUNT II.**

**IT IS FURTHER ORDERED** that Defendant FSB and PBI's Motion for Summary Judgment (Doc. 101), filed March 14, 2002, is **GRANTED AS TO COUNT III.**

**IT IS FURTHER ORDERED** that Defendant FSB and PBI's Motion for Summary Judgment (Doc. 101), filed March 14, 2002, is **GRANTED AS TO COUNT IV.**

**IT IS FURTHER ORDERED** that Defendant FSB and PBI's Motion for Summary Judgment (Doc. 101), filed March 14, 2002, is **DENIED AS TO COUNT VI.**

 

 

_____
**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**